(17 App. Div. 474.)

GOODMAN et al. v. MERCANTILE CREDIT GUARANTEE CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department.  May 14, 1897.)

1. CREDIT INSURANCE—INTERPRETATION OF POLICY.
    A credit insurance policy covered loss sustained by reason of the insolvency of debtors owing the insured for merchandise sold between September 1, 1892, and September 1, 1893, in excess of 1¾ per cent. on the total gross sales made during said period, "subject to the terms and conditions provided below and attached hereto."  A rider attached to the policy provided that it should cover all losses on sales made within one year preceding August 31, 1892, except such losses as the insured had notice of before August 31, 1892, or where an extension had been granted to the debtor, but it provided for no deduction from the gross sales made during such year.  Held, that in computing the amount of loss there was to be

deducted 1¾ per cent. only of the amount of sales made in the year beginning September 1, 1892.

2. SAME—WHEN LOSS ACCRUES—GENERAL ASSIGNMENT.
    A conveyance by a debtor to a trustee for distribution of the proceeds among specified creditors, reciting in the conveyance that such goods are "only a part of his property," is not a "general assignment for the benefit of creditors," within a credit insurance policy insuring against any "loss sustained by reason of the insolvency of debtors" of the insured, and defining such losses as those arising on sales by the insured to persons who have made a general assignment for the benefit of their creditors.

3. EVIDENCE—FOREIGN LAWS—PRESUMPTION.
    Where there is no proof of the law of another state, it will be presumed to be the common law.

4. ADMISSIONS—POWER TO RETRACT.
    Where a fact is admitted on the trial, the admission cannot afterwards be retracted unless some reason therefor is shown.

5. PAYMENT—SURRENDER OF NOTES.
    A debt is not paid by the surrender of the notes evidencing it, where the amount was added to a loan made to the debtor, and an obligation incurred by him to pay the whole sum.

6. CREDIT INSURANCE—COMPUTATION OF LOSS.
    A policy of insurance against loss by reason of the insolvency of the debtors of the insured limited the liability of the insurer to a specified sum on any one loss, and provided that, where only part of a loss is covered by the policy, "the proportionate part of everything realized or secured by the indemnified shall be credited to so much of the loss as is covered." Another clause provided that all payments and securities should be deducted before determining the insurer's percentage of loss. *Held,* that the provision for the apportionment of payments and securities between the part of a loss on which the insurer was liable and the part on which it was not liable was not affected by the later clause, which merely provided for the deduction of payments and securities without specifying the mode thereof.

Appeal from trial term, New York county.

Action by Leopold Goodman and others against the Mercantile Credit Guarantee Company of New York. From a judgment entered on a verdict in favor of plaintiffs, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

A. J. Dittenhoefer and David Murray, for appellant.
Morris J. Hirsch and Ralph S. Rounds, for respondents.

BARRETT, J.   The action is brought upon a policy of credit insurance, and the plaintiffs have recovered a verdict for the full amount claimed. Several objections are made to the recovery, which we will consider in order.

1. By the policy in question the defendant insures the plaintiffs, "to an amount not exceeding fifteen thousand dollars, against loss sustained by reason of the insolvency of debtors owing the indemnified for merchandise sold and delivered in the regular course of business, between the first day of September, 1892, at twelve o'clock noon, and the first day of September, 1893, at twelve o'clock noon, in excess of one and three-fourths (1¾ per cent.) per cent. on the total gross sales and deliveries made during said period, subject to the terms

and conditions printed below and attached hereto." By an attached rider it is provided:

"This contract covers .all losses on sales of merchandise for one year back from August 31st, 1892, to August 31st, 1891, but any and all losses which Messrs. Goodman Bros. have had notice of or sustained prior to August 31st, 1892, or where any extension has been granted to debtors for goods sold between August 31st, 1891, and August 31st, 1892, are not covered by this contract."

In computing the amount of loss covered by the policy, there has been deducted from the total amount of the plaintiffs' losses only a sum equal to $1\frac{3}{4}$ per cent. of the sales made between September 1, 1892, and September 1, 1893. The defendant claims that the initial loss to be borne by the plaintiffs is $1\frac{3}{4}$ per cent. of the amount of sales made during the period provided for in the rider, as well as in that covered by the policy proper. We do not concur in this view. The clause in the policy is plain, and provides for the deduction only of $1\frac{3}{4}$ per cent. of the amount of the sales made during the year from September 1, 1892, to September 1, 1893. The rider is equally plain. It makes no provision for any deduction whatsoever. Every ambiguity must be resolved against the defendant, which drew this agreement. Here there is no real ambiguity. To sustain the defendant's contention, we should have to read into the policy something to its advantage. Nor is it a reasonable presumption that the parties meant to provide for an initial loss for the period between August 31, 1891, and August 31, 1892, similar to that for the ensuing year. The nature of the indemnity provided for in the policy proper is entirely different from that furnished by the rider. Any loss sustained between September 1, 1892, and September 1, 1893, is the subject of insurance. On the other hand, losses on sales made during the preceding year are covered only if the plaintiffs had not sustained or had notice of them prior to August 31, 1892; and even such losses are not covered if any extension of credit has been granted. Upon the accruing of a debt for goods sold between August 31, 1891, and August 31, 1892, the debtor would be apt either to pay, or to secure an extension, or to exhibit some open evidence of insolvency. In either case the debt would not be provable under this policy. Probably but a small percentage of debts for goods sold during the preceding year would be provable under the terms of the rider. Consequently the theory—upon which the defendant's contention rests—which imports into the rider, by implication, each and every condition of the policy, is lacking in force or plausibility. It is much more probable that the rider was meant as an incident to the main insurance, and to be of benefit to the plaintiffs, than that it was intended as a system of insurance co-ordinate to that of the policy, and subject to all of its conditions, which might very probably (as it in fact proved) be a heavy burden to the plaintiffs, instead of an advantage.

2. Complaint is made of the allowance of the Thayer claim. This brings up the question of the proper interpretation of the second clause of the policy, which reads:

"The term 'loss sustained by reason of the insolvency of debtors' is agreed to mean losses upon sales made by the indemnified to debtors who have made a general assignment for the benefit of their creditors, or who have been ·de-

clared insolvent in legal or judicial proceedings, or whose business has been sold by the sheriff, marshal, or other public officer, under an attachment, execution, or other process, or against whom an execution has been returned unsatisfied upon a judgment obtained by the indemnified for sales of merchandise made during the period covered by this contract."

On January 4, 1893, Thayer, the debtor, executed a conveyance of "the entire stock of goods, wares, and merchandise in the store No. 265 Main street, in the city of Memphis, Tennessee,"—a more specific description of the property following,—to a trustee, with directions to sell, and apply the proceeds, after payment of fees and expenses, to the payment of 9 specified creditors, preferring them in the order in which they were named. The instrument refers in one place to the property transferred as "a part of his (the said V. B. Thayer's) property and effects," and in another as "only a part of his property." On January 11, 1893, Thayer executed another instrument, which recited the former, and conveyed any unexpended surplus to the same trustee for the payment, pro rata, of 83 creditors. The plaintiffs rely wholly upon these instruments, which they claim constitute a general assignment for the benefit of creditors. They first contend that by "general assignment," in the policy, is meant any such disposition by a debtor of his property as induces insolvency in the ordinary meaning of the term,—as renders it impossible for the plaintiffs to realize their claim. This seems to us to be reasoning in a circle. The policy provides for indemnity against losses by "insolvency," and then undertakes to define of what insolvency shall consist. This definition is binding upon the parties, and no loss which does not comply with it can be proved against the defendant. But the execution of a "general assignment" is employed as a test of "insolvency." Consequently, to say that such an assignment is meant as produces insolvency is either to say nothing at all or to abrogate the contract definition entirely and adopt one from some outside source, which may or may not be like that provided for. "Assignment" cannot be defined in terms of "insolvency" at the same time that "insolvency" is defined in terms of "assignment." Discarding such a definition, we see no reason why the term "general assignment for the benefit of creditors" should not be given its ordinary legal significance. Nor do we need to consider whether the law of the state where the debtor did business and committed the alleged act of insolvency should be applied. There is no evidence of what constitutes a general assignment in Tennessee, and the Tennessee law will consequently be presumed to be the common law. Monroe v. Douglass, 5 N. Y. 452; Latham v. De Loiselle, 3 App. Div. 527, 38 N. Y. Supp. 270,

It is contended that it is not necessary that an assignment, in order to be general, must cover absolutely all of the debtor's property, and that, if substantially all is transferred, the assignment is general. Such a doctrine has obtained elsewhere (Mussey v. Noyes, 26 Vt. 462), but not in this state. The question, however, need not be considered, since the facts are quite insufficient to bring the case within the operation of the rule contended for. The instrument on its face distinctly states that it conveyed but a portion of the assignor's property. This, at the least, put upon the plaintiffs the burden of showing that, nevertheless, substantially all of his property was conveyed. Practically

all of the evidence on this head was the fact of the return unsatisfied of an execution against the debtor's property in the county where the trust deeds were made and recorded, about a month after their execution. This was some, though by no means conclusive, evidence that Thayer had no tangible property in that county after the execution of the deeds. It was no evidence, however, as to his nonleviable property within that county, or as to his property of any description elsewhere. In fact, it appears affirmatively that the debtor, after the return of the execution, received the sum of $350 for certain book accounts which he owned, the face of which considerably exceeded that sum. On this branch of the case we hold that the instruments executed by Thayer do not on their face comply with the policy definition of a general assignment, and that the plaintiffs failed to show that they in fact brought him within the proper category.

3. Objection is made to the allowance of the Legg claim, or the whole thereof. This brings up for construction the fourth and eighth clauses of the policy. The former reads:

"When only a part of a loss is covered by this contract, the proportional part of everything realized or secured by the indemnified shall be credited to so much of the loss as is covered by this contract."

The latter reads:

"In adjusting losses under this contract and before determining the percentage of loss to be borne by the company under this contract, there shall be first deducted all sums paid, offered and accepted, settled, or secured, and also the value of any security or collateral held by the indemnified, and all credits, discounts, and allowances which the debtor would have been entitled to if the debt had been paid at the time of the receipt by the company of the notice provided for in condition 3 in rider attached" (referring to a notice to be given the defendant of the insolvency of debtors within 10 days after the occurrence of such insolvency).

The facts as to the Legg claim are as follows: In April, 1893, Legg owed the plaintiffs over $18,000 on notes given for the purchase price of goods covered by the terms of the policy. They advanced to him, in addition, the sum of $13,055, in order to take up certain diamonds and jewelry which he had pledged, and surrendered to him $6,458.96 of the merchandise notes. In return he delivered to them the diamonds and jewelry, and executed the following paper:

"This is to certify that Mrs. L. Goodman has this day loaned me the sum of nineteen thousand five hundred and thirteen $96/100$ dollars ($19,513.96), and has as collateral security mounted diamond goods, loose diamonds, and watches, which cost me about twenty-five thousand dollars, which she agrees to keep as long as I pay the interest monthly at the rate of 6 per cent. per annum, and will return said goods upon the payment of said sum ($19,513.96), nineteen thousand five hundred and thirteen $96/100$ dollars."

Although Legg had not paid the amount, the plaintiffs, when they came to present their proofs of loss, treated the $6,458.96 as paid, subtracted it from the whole merchandise debt, and presented a claim for the remainder, amounting to over $12,000, as an unsecured debt. The defendant contends that the $6,458.96 debt was still in existence on September 1, 1893, when the proofs of loss were rendered, and that consequently a debt of over $18,000 should have been stated, with security upon about a third thereof. As there is a limitation of $10,000 in the policy upon losses through any one debtor, it is imma-

terial to the defendant whether the whole merchandise debt amounted to $18,000 or only $12,000.   In considering this question, we shall treat the transaction of April, 1893, as one of the plaintiffs' and not of Mrs. Leopold Goodman's.   This question was brought up at the trial, and the plaintiffs' counsel conceded that Mrs. Goodman was not in fact the principal in the matter.   It is true that later he sought to withdraw this concession, but he gave no reason for seeking to do so, and there is no pretense that the fact is not as it was at first conceded to be.   We do not think the plaintiffs' counsel was at liberty to retract his stipulation arbitrarily and without assigning the least reason for such a course, and we must hold it binding for the purpose of the trial for which it was made.

We must also hold that the debt of $6,458.96 was not legally extinguished by the dealings had with Legg.   It is true that the notes were surrendered, but the debt was still kept alive.   The amount of it was added to the $13,055 of money loaned, and Legg became liable to pay the principal of and interest upon the whole, the goods being security for the performance of the obligation.   Not the debt, but the existing evidence of it, was extinguished.   It is impossible to say that the debt was not still in existence when the debtor remained liable to pay it.   It does not necessarily follow, however, that the plaintiffs were not justified in treating the secured part of the debt as canceled.   The determination of their rights depends upon the solution of the following question:   When a debt exists in excess of the policy limitation of $10,000, and payments have been made thereon after the insolvency, or security is held thereon at the time the proofs of loss are rendered, are the payments or the value of the security to be deducted before determining the percentage of loss to be borne by the defendant, or must the payments or the value of the security be apportioned, and the amount of the debt covered by the policy receive its share?   This question is by no means free from difficulty. Its solution depends upon the interpretation to be put upon the word "loss" as used in the fourth clause.   The plaintiffs contend that it means the amount remaining due upon a debt at the time of the rendition of the proofs of loss, while the defendant urges that it means the amount due at the time of the insolvency.   The former meaning is certainly, in the abstract, the natural one.   Money is not "lost" which the creditor is able to obtain, whether the payment be made before or after the commission of the act of insolvency.   But an examination of the fourth clause seems conclusively to demonstrate that the word is not there used in that sense.   To again quote it:

"When only a part of a loss is covered by this contract, the proportionate part of everything realized or secured by the indemnified shall be credited to so much of the loss as is covered by this contract."

It is impossible that "loss" here should mean the final unpaid balance of a debt, since it is provided that payments shall be credited upon such "loss."   If "loss" means the amount of debt remaining after the subtraction of all payments, then there can never be a "loss" to which payments are applicable.   Taking this clause alone, it must, we think, be held to mean that, where the amount due on a debt at the time of insolvency exceeds the amount permitted to be

proved on account of any one debt, payments subsequently made must be apportioned ratably between the amount covered by the policy and that not covered. But does such a rule conflict with that laid down in the eighth clause? If so, it would be our duty to hold the latter controlling, since it is more favorable to the plaintiffs, and any case of doubt or ambiguity must be resolved against the defendant. The eighth clause lays down the general rule that all payments and the value of all security shall be deducted before determining the defendant's percentage of loss. Where the debt is less than the policy limitation of $10,000, no question arises. Where it is greater, the fourth clause does not permit that the whole payment shall be deducted from the whole debt and the remainder taken as the sum for which, prima facie, or for the due proportion of which, the defendant is liable, but requires the subtraction of a proportionate part of the payment from that part of the debt covered by the policy. But we do not think the eighth clause, either directly or by fair implication, requires the former course. It simply directs the subtraction of all payments, but does not specify the manner of making such subtraction. The plaintiffs insist that the payment shall be applied only to that part of the debt which is not covered by the policy. But the eighth clause does not direct this. The defendant, on the other hand, contends that the subtraction shall be made in a manner more advantageous to it, viz. part from the portion of the debt covered by the policy, and part from the portion which is not. The fourth clause clearly indicates such a course, and we do not think the eighth can fairly be said to forbid it.

In considering this question, we have kept fully in mind the rule which gives the insured the benefit of any doubt fairly deducible from the terms of the contract drawn by the insurer. But, on the whole, we are unable to decide that such an ambiguity exists in the present policy. It appears with certainty that the meaning claimed for the word "loss" by the plaintiffs is not the meaning which that word bears in the fourth clause of the agreement, and, when the alternative meaning contended for by the defendant is given it, the clause is clear and unambiguous. It then becomes necessary, in accordance with settled rules of construction, to reconcile this clause with the other provisions of the contract, if it can be done without violence to the words of the instrument. This seems to us entirely possible. It is with unfeigned regret that we differ on this point with an able and learned court which has had the defendant's policy under consideration. Guarantee Co. v. Wood, 15 C. C. A. 563, 68 Fed. 526. It follows that the defendant was entitled to be credited upon the $10,000 of the Legg loss covered by the policy with the value of the security held upon the $6,458.96 part thereof, not exceeding that sum, since any excess of security would not be applicable to the balance of the merchandise debt. It is not possible, from the record before us, to determine the amount of the reduction, and a reversal becomes necessary. None of the other questions need be considered, as they are not likely to arise again in just the same form.

The judgment and order should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.